IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 1:16-CR-228 |
| | ) | |
| v. | ) | The Honorable Liam O'Grady |
| | ) | |
| JURIJS MARTISEVS, | ) | |
| | ) | |
| *Defendant*. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

For at least eight years, defendant Jurijs Martisevs ran Scan4you, a criminal business designed to help computer hackers defeat the defenses of victims' computers. Hackers all around the world, as a result, gained access to the sensitive consumer data of major corporations, as well as the private information stored on individuals' home computers. While the total harm Scan4you inflicted is untold, the Court found that the government had proven Scan4you was responsible for $20 billion in statutory losses, *see* Dkt. 245 (applying loss calculations within pre-sentence investigation report), and that Martisevs and his co-conspirator were jointly responsible for over $8.8 million in restitution, *see* Dkt. 248.

Martisevs is currently serving a 78-month sentence imposed by the Court in Rivers Correctional Institution (Rivers CI), a privately-managed Bureau of Prisons (BOP) facility. He now seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) based on his purported risk of contracting COVID-19 while incarcerated. In particular, Martisevs claims to have a chronic health condition and cites the presence of COVID-19 at Rivers CI as factors justifying compassionate release.

The Court should reject Martisevs's request. His claimed ailment has not been documented in any medical records or health evaluations within his BOP medical file or pre-sentence investigation report (PSR). Moreover, it is unclear that the medical records Martisevs has tendered in support of his motion substantiate his claim of a chronic lung condition. In addition, because Martisevs, a foreign national, has no ties to the United States and is, therefore, ineligible for home detention, he asks to be released to his home country of Russia. This proposal would require the Court to order the early termination of Martisevs's sentence and his release to the custody of Immigration and Customs Enforcement (ICE) officials, who would subject him to detention in an ICE facility pending removal to Russia. Removal is uncertain at this time due to widespread travel bans in place around the world. And even if Martisevs did return to Russia, he has not offered any record evidence to demonstrate that his risk of contracting COVID-19 would be lower in his home country than in his BOP facility.

In short, granting compassionate release in this case would fail to address a range of important practical and legal problems. Because Martisevs has not satisfied the standards in § 3582(c)(1)(A), the Court should deny his motion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Martisevs, a Russian national, was arrested in 2017 in Latvia in connection with an indictment returned by a federal grand jury in this District. He was subsequently extradited to the United States in June 2017 and, on March 12, 2018, he pleaded guilty to conspiracy, in violation of 18 U.S.C. § 371, and aiding and abetting computer intrusions, in violation of 18 U.S.C. §§ 1030(a)(5)(A) and 2.

On April 19, 2019, the Court imposed on Martisevs a 60-month term of imprisonment in connection with the conspiracy count and a 78-month term of imprisonment on the computer

intrusion count, to run concurrently.[1] Martisevs currently is serving his sentence in Rivers CI, a BOP facility located in North Carolina. Accounting for a sentencing reduction received for good behavior and credit for time served in other detention facilities pending his extradition to the United States and his transfer to a BOP facility, Martisevs is scheduled to be released on November 9, 2022.

On April 7, 2020, Martisevs wrote to the BOP and requested consideration for early release based on purported health risks. Def.'s Ltr. to BOP, Dkt. 265-1. On June 2, 2020, Martisevs filed his submission to the Court requesting to be heard on this issue since he has not received a response from the BOP.[2]

As of June 9, 2020, the BOP has reported that, out of a total of 1,175 inmates housed in Rivers CI, 1 is currently testing positive for COVID-19, 19 have recovered, and 0 inmates have died. According to the BOP website, https://www.bop.gov/coronavirus/index.jsp, these statistics are updated daily at 11:00 a.m. Since the government first became aware of Martisevs's intention to file his motion with the Court, the number of infected inmates has steadily declined, adding to the total number inmates who have since recovered from COVID-19.

---

[1] At sentencing, the Court found that the Probation Officer had correctly calculated the guidelines sentence as 180 months of imprisonment.

[2] On March 4, 2020, Martisevs filed a *pro se* motion asking this Court to reduce his sentence pursuant to the First Step Act. The instant filing makes no mention of the prior filing, and the Court has not yet ordered a response by the government.

The government can provide additional briefing upon request. In the meantime, the government notes that Martisevs, in support of his *pro se* motion, cites 18 U.S.C. § 3582(c)(2) and § 3624(c)(2), but neither provision controls. The former statutory provision is inapplicable because Martisevs was not sentenced to a term of imprisonment based upon a sentencing range that subsequently has been lowered by the U.S. Sentencing Commission, and the latter statutory provision authorizes only BOP (not the Court) to place prisoners in home confinement under certain conditions. As a result, in the government's view, the Court can (and should) deny Martisevs's *pro se* motion.

**RESPONSE**

**I.    Martisevs's request for compassionate release to a foreign country should be evaluated against a practical and legal backdrop.**

The BOP is actively working on the critical problem of containing the spread of the coronavirus within prisons and has implemented a number of health-and-safety procedures governing all BOP facilities, including Rivers CI.  BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.

Importantly, nothing in the CARES Act provides for the relief Martisevs now seeks— early termination of his custodial sentence and release to an ICE facility pending his removal to a foreign country.  Instead, where the legislation concerns federal inmates, Congress focused on temporarily enlarging the discretion of the BOP to place inmates in home confinement.  *See* CARES Act, Section 12003(b)(2) (temporarily expanding BOP's existing authority under § 3624(c)(2) to designate prisoners to home confinement).  And since March 26, 2020, BOP has used that authority to place additional inmates on home confinement (*see* https://www.bop.gov/ coronavirus/index.jsp), focusing on, among other factors, the vulnerability of the inmates, the prisons most at risk, and the dangers posed by the inmates if released.

In addition to its efforts to increase the use of home confinement, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A). However, as of the writing of this responsive pleading, the government is unaware of instances in which courts have granted a foreign defendant's request to terminate his custodial sentence and order him released to ICE pending removal to his home country.  Such a request raises a

number of practical concerns, including whether ICE has the necessary resources to take custody of foreign defendants ahead of their expected release from BOP; whether ICE has the resources to ensure the health and safety of their staff and additional foreign defendants transferred to their custody; and, whether a defendant's home country is willing or able to repatriate citizens who have recently been incarcerated in the United States.[3] Indeed, without the appropriate resources and safety measures in place, release to ICE may increase the very health and safety risks that courts, the government, and defendants are seeking to mitigate.

In contrast to the vast logistical and practical uncertainties surrounding Martisevs's proposal to be transferred to ICE custody and released to a foreign country, the BOP has significantly altered operations within federal prisons to implement guidance issued by the Centers for Disease Control and Prevention (CDC) to manage the transmission of COVID-19. The current modified operations plan requires that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease. Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has limited the movement of inmates and detainees among its facilities. Though there are exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. Every newly-admitted inmate is screened for COVID-19 risk

---

[3] The government has made inquiries about ICE's readiness to take custody of federal inmates earlier than their expected release from BOP and has been unable to receive definitive guidance.

factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and have remain suspended through at least June 9, 2020, to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Martisevs's current request envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to assess the capacity of immigration

6

authorities take custody of foreign defendants on an accelerated schedule; ensure that appropriate resources are available to ensure inmates' and ICE staff's health and safety; and, effect removals in a time when widespread travel bans are in place.  Unfortunately, many of these facts are either quickly changing or not readily available—and making decisions without the necessary information could nullify the intended goal of any court order.

Under the present circumstances and, in particular, the circumstances surrounding a foreign national's request to be removed to his home country, courts should consider a wide range of important factors that have bearing on individual inmates' health, public health, and the risks associated with a foreign defendant's recidivism:

- *Avoiding recidivism.*  The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points.[4] This risk is heightened when a serious criminal offender seeks release to a foreign country outside the reach of U.S. law enforcement and outside the reach of U.S. Probation Officers who can help offenders build a law-abiding life upon release.

- *Addressing the impact of releasing a foreign defendant to the custody of ICE.*  A release order in a case involving a foreign national should include measures to ensure that an inmate who is presently incarcerated is not infected by the time the Court orders any release of an inmate into the custody of ICE.  A release order should not only assess any additional risks that could be brought on by a defendant and any individuals presently working at, or housed in an ICE facility, including ICE officials, who may be required to supervise the defendant if he is transferred there.  Courts should also consider how the accelerated release of a BOP inmate into ICE

---

[4] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12.

custody could impact the availability of health resources at ICE facilities, such as testing and protective equipment;

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.* Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in a BOP facility, *see* https://www.bop.gov/coronavirus/; and

- *Assessing how much release would affect the particular inmate's health.* To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health, odds that may be difficult for a Court to determine where release plans involve relocating an inmate to an ICE facility, pending removal to a foreign country that is grappling with significant and widespread health challenges resulting from the pandemic.

This list is not exhaustive and, indeed, could include many additional considerations. However, the factors cited above illustrate the fact that, in his motion, Martisevs does not adequately grapple with the numerous practical impediments to ensuring his health and safety, the health and safety of others, and the feasibility of his removal request.

The above points inform the legal framework discussed below.

## II. Martisevs cannot establish extraordinary and compelling reasons to warrant granting his request.

In any event, Martisevs cannot establish "extraordinary and compelling reasons to warrant . . . a [sentencing] reduction" under § 3582(C)(1)(A)(i) for two reasons.[5] First, his

---

[5] The government notes that the exhaustion requirement of § 3582(c)(1)(A) does not to appear to be at issue here. Section 3582(c)(1)(A) provides that a defendant cannot obtain relief from this Court until BOP is given 30 days to evaluate the defendant's motion for compassionate release based on the threat of COVID-19. The Third Circuit recently confirmed that where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. Apr. 2, 2020). Here, Martisevs sent BOP a letter on April 7, 2020,

allegation that he suffers from chronic bronchitis or chronic issues affecting the lungs is not substantiated by medical records. Second, his proposal—to be released into the custody of ICE, where he will be detained pending an uncertain removal to Russia—does not appear to be a practical or viable alternative to the resources available to him at the BOP facility where he is currently housed.

### A. *Statutory Framework for Evaluating Compassionate Release*

A § 3582(c)(1)(A) sentencing-reduction motion is not a flexible equitable remedy equivalent to clemency or parole. Instead, Congress created a narrow statutory framework in which defendants, the BOP, and the Sentencing Commission all play a relevant part. To that end, Congress has not itself delineated the universe of "extraordinary and compelling reasons" that could warrant compassionate release. Instead, it has delegated that responsibility to the Sentencing Commission through several statutory provisions. For instance, in 28 U.S.C. § 994(a)(2)(C), Congress directed the Sentencing Commission to adopt policy statements regarding "the appropriate use of . . . the sentence modification provisions set forth in section [] . . . 3582(c) of title 18." Section 994(t) further advised that "[t]he Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In its instructions to the Sentencing Commission, however, Congress made clear that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." *Id*.

---

seeking evaluation for relief under the CARES Act based on purported health issues. Since more than 30 days have since passed without a response from the BOP, the government does not here invoke § 3582's mandatory claims-processing rule.

Pursuant to Congress's instructions, the Sentencing Commission adopted a conforming policy statement that creates three requirements for compassionate release under § 3582(c)(1)(A). U.S.S.G. § 1B1.13. First, a court must conclude that "[e]xtraordinary and compelling reasons warrant the reduction." *Id.* § 1B1.13(1)(A).[6] Second, the court must conclude that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." *Id.* § 1B1.13(2). Third, the court must conclude that "[t]he reduction is consistent with this policy statement." *Id.* § 1B1.13(3).

The Sentencing Commission has also identified four categories of extraordinary and compelling reasons:

(A) Medical Condition of the Defendant;

(B) Age of the Defendant;

(C) Family Circumstances; and

(D) Other Reasons.

U.S.S.G. § 1B1.13, cmt. n.1. Commentary to § 1B1.13, in turn, clarifies that the open-ended provision—labeled "Other Reasons"—only authorizes compassionate release if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.*

Consistent with subdivision (D), BOP has identified several nonexclusive factors for determining whether "other" extraordinary and compelling reasons exist. These include the defendant's criminal and personal history, the nature of his offense, disciplinary infractions,

---

[6] The statement alternatively provides that absent extraordinary and compelling reasons, a court may find that a defendant who is at least 70 years old and has served at least 30 years on his conviction is eligible for a reduction. *See* U.S.S.G. § 1B.13(1)(B).

length of sentence and amount of time served, current age and age at the time of offense and sentencing, release plans, and "[w]hether release would minimize the severity of the offense." BOP Program Statement 5050.50 (Jan. 17, 2019), *available at* https://www.bop.gov/policy/progstat/5050_050_EN.pdf. The Program Statement explains that BOP authorizes compassionate release under § 3582(c)(1)(A) in "particularly extraordinary or compelling circumstances which could not reasonably have been foreseen by the court at the time of sentencing." *Id.* at 1.

Ultimately, it is the defendant's burden to prove that he is entitled to compassionate release under § 3582(c)(1)(A)(i). *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D. Mo. 2019); *see generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent some reason to believe that Congress intended otherwise, . . . we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief.").

> **B.** *Martisevs has failed to make a proper showing of particularized risk to justify compassionate release.*

Courts have properly concluded that a risk of being infected by the coronavirus fails by itself to justify compassionate release. "[I]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, — F. Supp. 3d —, No. 2:07CR150, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, No. 3:19CR112, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)). Here, Martisevs has not made either showing.

First, Martisevs has failed to show that he has a particularized risk of contracting, or experiencing adverse consequences from, COVID-19. The crux of his claim is that he suffers

11

from "chronic bronchitis" or other chronic lung or respiratory conditions which, he claims, would make him more susceptible to COVID-19. Def.'s Mot. at 1. These allegations, however, find no support in his BOP medical file, *see* Gov't's Exhibit 1, or his PSR. In no fewer than three medical evaluation records found within his BOP medical file, neither medical personnel nor Martisevs himself reported any history of the chronic health conditions he now describes in his motion. For example, a "Report of Medical Evaluation" dated May 21, 2019, showed that BOP performed a wellness check on Martisevs and found no abnormalities in the functioning of his lungs, chest, or heart—or any other health system or organ. *Id.* at 22. On a different medical screening sheet dated May 21, 2019, Martisevs is listed as not having hypertension. *Id.* at 14. And within a document entitled "Federal Bureau Dental/Medical History Form," dated May 8, 2019—a document which contains the prompt, "Circle any of the following that you have had," above several columns of chronic or congenital health conditions, including chronic bronchitis—no health conditions were circled. *Id.* at 39. In the same form, no health conditions were recorded next to the prompt, "Do you have any other disease, condition, or problem?" *Id.*

And while Martisevs has tendered medical documents purporting to support his claim of chronic health conditions, they offer weak proof at best. The first of the two documents appears to address a spinal disc injury from 2008 that impacted his leg and makes only a passing reference to asthma. *See* Dkt. 269 (Medical record from Latvia). The second record appears to contain a medical diagnosis related to one specific time Martisevs was ill with bronchitis in 2016, not a diagnosis of a chronic health condition. *See id.* (Medical record from Russia). If Martisevs had, in fact, suffered from a chronic health condition, it is unclear how this condition would have escaped the attention of the medical professionals he has encountered while in the custody of the U.S. Marshals and BOP, or why he did not alert medical professionals to this

condition. Indeed, his BOP medical file makes clear he had opportunities to bring even minor health concerns to the attention of medical staff. *See, e.g.*, Gov't's Ex. 1 at 77–87 (documenting requests for, among other things, dental care and special shampoo, and actions taken by BOP staff). Importantly, until this recent litigation, Martisevs consistently has told government officials and medical professionals that he has no history of serious or chronic medical conditions. *See* PSR ¶ 83 ("[Martisevs] noted that he has no history of any serious or chronic medical conditions or illnesses, no prior hospitalizations, no allergies, and is currently not taking any prescribed medications.")

And with respect to an individualized showing regarding Martisevs's prison facility, his claim is equally unpersuasive. He currently is incarcerated at Rivers CI, a privately-managed BOP facility. According to the latest statistics available from the BOP, Rivers CI currently has 1 inmate testing positive for COVID-19; 19 inmates previously testing positive who have since recovered; and 0 inmate deaths. Those numbers are relative to a total inmate population of 1,175 as of June 9, 2020.[7] All inmates who have tested positive are being appropriately treated or isolated according to CDC guidelines adopted by the BOP. The facility continues to adhere to the BOP modified operations plan described above in the government's responsive pleading, and has, among other steps, restricted prisoner movements within the facility, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, and provided masks and hand cleaners. Based on the statistics available from the BOP, the rate of infection at Rivers CI has been on a steady decline in the last several weeks. For all of these reasons,

---

[7] The total number of inmates was provided to the government by the Rivers CI management staff.

Martisevs has not shown, in any particularized fashion, that he is entitled to additional relief based on the risk of contracting COVID-19.

### C. *Martisevs has failed to show how his proposed release plan presents a viable alternative.*

Setting aside Martisevs's failure to articulate particularized risk, the Court should deny the relief Martisevs seeks because he has failed to demonstrate that his proposed release plan presents a viable alternative to BOP custody. Courts in this district have evaluated whether the release plan proposed by defendants would introduce new risks to themselves or others. *See, e.g., Feiling*, 2020 WL 1821457, at *8 ("Defendant fails to establish how his release on home confinement presents a viable alternative sentence. Indeed, Defendant's release on home confinement presents its own risks to Defendant's health, the health of his family and public safety.").

Even if the Court were to credit Martisevs's alleged health concerns, he has failed to establish that release from BOP—which has adopted a thorough set of healthcare and screening procedures to manage and mitigate the transmission of COVID-19—to the custody of ICE is a viable alternative. Based on the government's current information, it is unclear that ICE has the resources to take custody of BOP inmates earlier than their expected release date. It is also unclear that Martisevs's home country is in a position to receive him while severe travel restrictions are in place. *See* U.S. Embassies and Consulates in Russia, *Covid-19 Information*, https://ru.usembassy.gov/covid-19-information/ (updated June 8, 2020).

### D. *Other 3553(a) factors counsel against granting the requested relief.*

The seriousness of Martisevs's crimes and the risk of his recidivism in a country outside the reach of U.S. law enforcement additionally counsel against early termination of his sentence. Martisevs was convicted of running an online criminal service that enabled criminals around the

world to infiltrate victims' computers to steal and misuse their information. The $20 billion statutory loss amount, which the Court applied in calculating Martisevs's sentencing guidelines range, *see* Dkt. 245, only represents a small fraction of the harm traceable to a few of his thousands of criminal clients. Computer hacking costs the U.S. economy billions of dollars every year. *See* The Council of Economic Advisors, *The Cost of Malicious Cyber Activity to the U.S. Economy*, at 36 (Feb. 2018) (estimating that computer hacking cost the U.S. economy between $57 to 109 billion in 2016); *Study: Hackers Cost More Than $445 Billion Annually*, U.S. News & World Report (June 9, 2014).

It is difficult and costly for the United States to investigate and prosecute crimes committed by foreign actors. This practical reality is unfortunately exploited by foreign cybercriminals. In fact, Martisevs and his co-defendant chose to continue running Scan4you for years even after learning that they were being investigated by the United States. Given the allure of foreign-based online crimes targeting U.S. victims—including profitability and a relatively low risk of apprehension—the Court should conclude that Martisevs's risk of recidivism is too high to warrant early termination of his custodial sentence.

Finally, if this Court were to disagree with the government's position above, any order that this Court issues that grants a defendant compassionate release should require the defendant to undergo a 14-day quarantine that BOP controls before any release into the custody of any other government agency, including ICE.

## CONCLUSION

While the pandemic has created unprecedented challenges, district courts evaluate requests for compassionate release based on the risk of contracting COVID-19 on a case-by-case basis. Martisevs has failed to make a particularized showing of risk and has failed to present a viable alternative to serving his sentence under the care of the BOP. The Court should therefore deny Martisevs's motion.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

By: /s/ Laura Fong

Laura Fong
Senior Trial Attorney
Computer Crime & Intellectual Property Section
Department of Justice

Alexander P. Berrang
Assistant United States Attorney
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 10, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of filing (NEF) to all counsel of record.

*Laura Fong*
Laura Fong
Senior Trial Attorney
Computer Crime & Intellectual Property Section
Department of Justice